IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Criminal No. 5:12-CR-27 |
| v. ) | |
| ) | |
| ) | By: Michael F. Urbanski |
| MATTHEW J. MAHONE, ) | Senior United States District Judge |
| Defendant-Petitioner ) | |

CLERKS OFFICE US DISTRICT COURT
AT ABINGDON, VA
FILED
February 13, 2025
LAURA A. AUSTIN, CLERK
BY: /s/ Amy Fansler
     DEPUTY CLERK

## MEMORANDUM OPINION

This matter comes before the court on Matthew J. Mahone's motions for a sentence reduction filed pursuant to 18 U.S.C. § 3582(c)(1)(A). Mahone filed a pro se motion on September 19, 2024, ECF No. 74, and the Federal Public Defender filed a supplemental motion on his behalf on November 27, 2024. ECF No. 81. The government filed a response in opposition on January 9, 2024, ECF No. 86, and Mahone filed a reply on February 7, 2025. ECF No. 87. As discussed more fully below, the court **DENIES** his motions.

### I. Background

On June 27, 2012, Mahone entered into a non-binding plea agreement in which he pled guilty to one count of an Information charging him with knowingly and intentionally distributing methadone with death resulting from the use of the substance, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). Plea Agreement, ECF No. 38. In the Statement of Facts (SOF), Mahone agreed that on April 16, 2010, in Staunton, Virginia, he purchased ten 10 mg methadone pills and later that same day, sold two of the pills for a total of $10.00 to a 14-year-old boy, J.P., who ingested the pills and became unresponsive. Paramedics were called but J.P. died, and the cause of death was attributed to acute methadone toxicity. SOF, ECF No. 42.

Mahone and J.P. were part of a group of seven friends who had gone camping the day before, and consumed alcohol, marijuana, and methadone as part of the outing. Pre-Sentence Investigation Report (PSR), ECF No. 57 ¶ 3. On December 3, 2012, Mahone was sentenced to a term of 180 months to be followed by a 10-year period of supervised release. J., ECF No. 55. Mahone was 20 years old at the time he committed the offense. PSR, ECF No. 57 at 2.

Mahone currently is incarcerated at Federal Correctional Institution Beckley and has a projected release date of October 29, 2030.[1] Prior to beginning his federal term of incarceration, Mahone served a 6-year sentence following conviction in state court for using a firearm during the commission of a felony, robbery of a residence with a firearm, and possession of a firearm by a convicted felon. PSR, ECF No. 57 ¶ 24; Sent. Monitoring Data, ECF No. 81-1. Mahone has been in custody since January 26, 2011. PSR, ECF No. 57 ¶ 41.

Mahone seeks compassionate release based on his allegation that his father is incapacitated by poor health and that Mahone is the only available caregiver for him. Mot. and Supp. Mot., ECF Nos. 74, 81. The government counters that Mahone has not shown evidence of an extraordinary and compelling reasons warranting compassionate release, and that even if he had done so, the 18 U.S.C § 3553(a) factors preclude relief. Resp., ECF No. 86.

## II. Compassionate Release

The compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act, authorizes courts to modify terms of imprisonment as follows:

> The court may not modify a term of imprisonment once it has been imposed except that—in any case—the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the

---

[1] https://www.bop.gov/mobile/find_inmate/byname.jsp#inmate_results (search "Matthew Mahone") (last viewed Feb. 12, 2025).

> defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i) extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

Accordingly, Mahone's requested relief requires the court to consider (1) if he exhausted his administrative remedies; (2) if so, whether there are extraordinary and compelling reasons that warrant a reduction in his sentence; and (3) if so, what, if any, sentence reduction is appropriate after considering the applicable 18 U.S.C. § 3553(a) factors.

**A. Exhaustion**

The court begins by considering the threshold requirement for obtaining relief under § 3582(c)(1)(A). United States v. Muhammad, 16 F. 4th 126, 129–30 (4th Cir. 2021). This requirement, which is non-jurisdictional, is "satisfied if a defendant requests the Bureau of Prisons to bring a motion [for compassionate release] on their behalf and either fully exhausts all administrative rights to appeal the Bureau's decision or waits 30 days from the date of their initial request to file a motion in the district court." Id. at 131. Mahone submitted a request to prison staff asking for compassionate release based on his father's health and his request was denied on April 15, 2024, ECF No. 75-1, and the government does not contest exhaustion. Resp., ECF No. 86 at 5–6. Accordingly, the court finds that Mahone satisfied the exhaustion requirement.

3

### B. Extraordinary and Compelling Reasons

The court next must consider whether it should reduce the term of imprisonment. Effective November 1, 2023, the United States Sentencing Commission amended the policy statement that addresses motions for sentence reduction under 18 U.S.C. § 3582(c)(1)(A) when a defendant alleges that extraordinary and compelling reasons warrant a reduction. See U.S. SENT'G COMM'N, GUIDELINES MANUAL § 1B1.13 (Nov. 2023) (USSG or guidelines). The revised policy statement will be applied to Mahone's motion.

#### (1) Father's Health

Mahone claims that he is entitled to compassionate release based on his father's poor health and the fact that no one else is available to care for him. Under the relevant revised guideline, USSG § 1B1.13(b)(3)(C), to demonstrate an extraordinary and compelling reason for a sentence reduction based on the need to care for a parent, the defendant must show "[t]he incapacitation of the defendant's parent when the defendant would be the only available caregiver for the parent." Applying the policy statement to Mahone's motion, the court must first determine whether Mahone has shown that his father is "incapacitated." If Mahone makes that showing, the court next looks at whether Mahone has shown that he is his father's only available caregiver.

#### (a) Incapacitation

Mahone asserts that his father has suffered from multiple significant health issues in the last several years that have left him incapacitated and as a result, he needs help to complete his activities of daily living and needs someone to take him to dialysis appointments. Mahone presented a list of illnesses and ailments with which his father has been diagnosed, including

4

spina bifida, neurogenic bladder, kidney stones, hypertension, chronic kidney disease, coronary artery disease, status post-CAD of autologous artery bypass graft without angina, acute renal failure with acute tubular necrosis superimposed on stage 3b chronic kidney disease, pseudomonas infection, bladder stone, and stage 4 pressure injuries of right and left ischium. Med. R., ECF No. 81-10. Mahone also included a letter from the physician treating Mahone, who stated the following:

> It is my medical opinion that Daniel Mahone has multiple chronic medical problems limiting his mobility and ability to care for himself. Accordingly, he would benefit from a caretaker or care-partner, like his son, that can help him with tasks of daily living throughout the day and week including grocery shopping, cooking, housekeeping, transportation to and from medical appointments including dialysis 3 days/week, wound care and dressing changes.

Letter from Anita Vincent-Johnson, M.D., ECF No. 81-11.

Regarding his father's need for dialysis three times per week, it appears that the dialysis center is about a ten-minute drive from his father's house. Letter from Catherine Harpine, ECF No. 81-7. His father's insurer has arranged transportation to the dialysis center through an outside transportation service, but the driver does not always show up and Mahone's father sometimes misses dialysis appointments. Supp. Mot., ECF No. 81 at 9. Mahone did not describe or provide evidence of how often the driver has arrived late or failed to appear to take his father to his dialysis appointments.

Mahone's father uses a walker to assist with ambulation when he is at home and he uses a wheelchair when he leaves the house for a significant time. Letter from Daniel Mahone, ECF No. 81-2. Mahone's father can shower, dress, and feed himself. Mot., ECF No. 81 at 10. The letter from Mahone's father's doctor states that Mahone could help his father with

wound care and dressing changes, but Mahone did not explain whether his father currently performs wound care and dressing changes himself or receives help from another person in performing the task.

The sentencing guidelines do not provide a definition of "incapacitated," and the parties disagree on what a defendant must show to demonstrate that his parent is "incapacitated." Mahone argues that the court should look at the "common law" standard of incapacitation, which he states, without citation to authority, is "suffering from a serious medical condition to the point of being in need of a caretaker." Supp. Mot., ECF No. 81 at 6–7. The court does not find this definition helpful because it provides no real standard. It says no more than "in order to determine if a person is incapacitated to the point of needing a caretaker, the court must determine that he needs a caretaker."

Mahone also suggests that the court look at the definition of "incapacitation" found in the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq. (FMLA). For purposes of the FMLA, "[t]he term incapacity means inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefore, or recovery therefrom." 29 C.F.R. § 825.113(b). A serious health condition is defined as "illness, injury, impairment or physical or mental condition that involves inpatient care as defined in § 825.114 or continuing treatment by a health care provider as defined in § 825.115." 29 C.F.R. § 825.113(a).

However, the definition of "incapacitation" in the FMLA is not easily applicable to motions for compassionate release, if for no other reason than the definition contains no consideration of the length of time a person must be unable to work, attend school, or

6

perform other regular daily activities due to a serious health condition. The FMLA allows an employee to take unpaid leave to care for an incapacitated family member for up to twelve weeks in a one-year period. The lack of a time limitation in the definition of "incapacitation" makes sense in that context because, for example, a person without any accrued leave may need to miss work for a short time to care for a family member recovering from surgery. Indeed, looking at the definition of a "serious health condition" involving "inpatient care," a person may qualify for FMLA leave to attend to a relative who requires an overnight stay in a hospital, hospice, or residential medical facility. 29 U.S.C. §§ 825.113, 825.114. While such a person is "incapacitated" for purposes of the FMLA, they clearly would not be "incapacitated" for purposes of showing an extraordinary and compelling reason for compassionate release. Therefore, the definition of "incapacitation" in the FMLA, while perhaps providing some guidance, cannot be relied upon by a court when assessing a motion for sentence reduction under USSG § 1B1.13(b)(3)(C). See United States v. Jackson, No. 7:15CR00094, 2024 WL 3912948, at *2 (W.D. Va. Aug. 23, 2024) (Jones, J.) (describing the FMLA standard as "instructive" but relying on Bureau of Prison (BOP) Program Statement 5050.50 to deny a motion for compassionate release where defendant's relative was not disabled because he could render self-care and was not confined to a bed or chair).

The government argues that this court also should rely on BOP Program Statement 5050.50, which describes the procedures the BOP uses to implement requests for compassionate release. The program statement defines "incapacitation" as "a serious injury, or a debilitating physical illness and the result of the injury or illness is that the spouse ... is completely disabled, meaning that the spouse ... cannot carry on any self-care and is totally

7

confined to a bed or chair." United States v. Collins, No. 15-10188-EFM, 17-10061-EFM, 2020 WL 136859, at *4 (D. Kan., Jan. 13, 2020) (quoting BOP Program Statement § 5050.50 at 10).

While the program statement is not binding on the courts, it indicates the severity of incapacitation that the BOP finds necessary in determining that a defendant has demonstrated an extraordinary and compelling reason for compassionate release, and many courts, including this one, look to the program statement for guidance. See United States v. Vaughn, Nos. 7:10-CR-17, 7:19-CR-25, 2025 WL 84215, at *4 n.4 (W.D. Va. Jan. 13, 2025) (Urbanski, J.) (recognizing that the BOP policy statement is not binding, but looking to it for guidance); United States v. Castle, No. 2:15-cr-00190-KMJ-DB-2, 2024 WL 3429668, at *2 (E.D. Cal., July 16, 2024) (noting the program statement is not binding, but referring to it for persuasive guidance); United States v. White, No. CR 16-40, 2021 WL 1721016, at *4 (E.D. La. Apr. 30, 2021) ("For guidance on what constitutes 'incapacitation,' courts look to the BOP's non-binding Program Statement for processing compassionate release requests."); United States v. Bolden, No. 16-320, 2020 WL 4286820, at *4 (W.D. Wash. July 27, 2020) (noting that courts look to BOP program statement for guidance in compassionate release cases); United States v. Doolittle, No. 19-501, 2020 WL 4188160, at *2 (D.N.J., July 21, 2020) (same); United States v. Collins, No. 15-10188, 2020 WL 136859, at *4 n.13 (D. Kan. Jan. 13, 2020) (looking to program statement for guidance in absence of case law setting forth standard for incapacitation of a spouse).

In United States v. Taveras, 731 F.Supp.3d 94, 99 (D. Mass. April 12, 2024) (citing United States v. Beck, 425 F.Supp.3d 575, 579 (M.D.N.C. 2019)), a district court found that

8

relying solely on BOP Program Statement 5050.50 was inappropriate, reasoning that revisions to 18 U.S.C. § 3582(c)(1) were intended to provide courts with more oversight and discretion and allow for sentence reductions even when the BOP found they were not appropriate. The Taveras court looked at the definition of an incapacitated person in the Uniform Probate Code, Section 5-102(4) (1969, revised 2019) (UPC). Under the UPC, "a person is 'incapacitated' when that individual, 'for reasons other than being a minor, is unable to receive and evaluate information or make or communicate decisions to such an extent that the individual lacks the ability to meet essential requirements for physical health, safety, or self-care, even with appropriate technological assistance.'" Taveras, 731 F.Supp.3d at 99. The court commented the following:

> The definition of "incapacitation" under the UPC is a stringent standard in order to protect the rights of the subject of the guardianship proceedings. This interpretation of "incapacitation" creates a high bar for a finding that a defendant's parent is incapacitated under U.S.S.G. § 1B1.13(b)(3)(C). However, the interpretation based on the UPC is both compatible with the strict requirements for "extraordinary and compelling circumstances" required for compassionate release and effectuates the federal policy that "compassionate release is an 'extraordinary' remedy." [United States v. Ramirez, 459 F. Supp. 3d 336, 338 D. Mass. 2020)] (citing 18 U.S.C. § 3582(c)(1)(A)(i))); See [Parmenter v. Prudential Ins. Co. of Am., 93 F.4th 13, 21 (4th Cir. 2024)].

Taveras, 731 F. Supp. 3d 94 at 99–100. See also United States v. Ross, No. 4:17-cr-00102-AKB-1, 2024 WL 3677337, at *2 (D. Idaho, Aug. 5, 2024) (citing Taveras and denying motion for compassionate release in part because defendant did not show that his mother "lack[ed] the ability to meet essential requirements for physical safety, safety, or self-care.").

9

Recognizing that the neither the BOP program statement nor the UPC definition of "incapacitation" are binding, but looking to both for guidance, the court finds that the evidence that Mahone has submitted in this case does not support the conclusion that his father is "incapacitated." It is undisputed that Mahone's father suffers from several ailments with the result that he uses a walker at home and a wheelchair on outings if he is going to be gone from home for a significant time. He goes to dialysis three times per week to a center that is approximately a ten-minute drive from his house and has arranged for transportation for those outings through his insurance company. Mahone alleges that the transportation is unreliable but has provided no evidence regarding how many times the driver has been late or failed to show up to take his father to dialysis. Mahone's father also needs assistance with transportation to other appointments and help with housekeeping, laundry, grocery shopping, preparing food, and with wound care and dressing changes. Letter from Dr. Vincent-Johnson, ECF No. 81-11. Mahone's father currently is able to shower, dress, and feed himself. Supp. Mot., ECF No. 81 at 10.

Courts addressing similar allegations of incapacitation in motions for compassionate release have found that such circumstances do not rise to the level of an extraordinary and compelling reason for a sentence reduction. For example, in Collins, 2020 WL 136859 at *4, the court found that allegations that a defendant's spouse was incapacitated fell short because although the spouse had physical limitations and could benefit from some assistance, he was able move around the house with the use of a cane, had daily help from a nurse who assisted him with certain tasks, and "the state" drove him to pain management therapy. The court

concluded that although the spouse had some significant physical limitations, it did not appear that he was incapacitated such that a reduction in his sentence was warranted. Id.

Similarly, in Taveras, the court found that under the UPC standard, the defendant's mother was not incapacitated because she could walk freely through her apartment and communicate effectively, and received assistance through her insurance company including daily visits on weekdays by a person who helped her with groceries, laundry, and cleaning for two to three hours per day and a nurse who visited twice a day every day to assure she was taking her medication correctly. Taveras, 731 F.Supp.3d at 97, 100. "While the Court is sympathetic to Ms. Cabrera's ailments, her circumstances do not rise to the level of an "extraordinary and compelling" reason." Id. at 100.

Mahone cites United States v. Movahhed, No. 2:19-cr-93-TC-BCW, 2024 WL 496061, at *3 (D. Utah Feb. 8, 2024) for its holding that the defendant's mother was incapacitated because she required assistance with transportation to medical appointments, managing her medication, and maintaining her household. However, the court in that case did not describe the evidence before it other than saying the defendant's mother was chronically ill and permanently disabled. Id. In addition, the court based its decision to grant compassionate release not only on its finding that the defendant's mother was incapacitated, but also because the defendant had epilepsy that was not being adequately treated in prison, with the result that he was having seizures two or three times per week. Id. Also, the defendant had served "the great majority" of his 60-month sentence and given some confusion at sentencing, had possibly serve the entire sentence. Id. at 1, 4. The court found that the combination of the defendant's health, his mother's health and the expectations of the parties at sentencing rose

11

to the level of extraordinary and compelling reasons to reduce his sentence. Id. at 4. Mahone's case is distinguishable from that of Movahhed because he has not presented evidence that his father is permanently disabled by his impairments, makes no allegation that he himself is ill, and has not served the "great majority" of his sentence.[2]

Mahone also cites in support United States v. Paris, No. CR 19-119-BLG-SPW-01, 2024 WL 1973153 (D. Mont., May 3, 2024), United States v. Blackbird, No. CR 5-174-GF-BMM-1, 2024 WL 3552446 (D. Mont. Jul. 26, 2024), and United States v. Ingram, No. 1:18CR00019-02, 2024 WL 1719932 (W.D. Va. Apr. 22, 2024) (Jones, J.), all of which are factually distinguishable from his case. In Paris, the defendant's mother had been sent by her care team to live in a care home after it was determined that it was unsafe for her to live at home because of her kidney disease, chronic obstructive pulmonary disease (COPD), congestive heart failure, and spinal dysplasia. Paris, 2024 WL 1973153, at *3. There is no medical evidence in the records submitted by Mahone suggesting that it is unsafe for his father to remain at home.

In Blackbird, the court cited to medical records submitted by the defendant that his mother was diagnosed with Stage III COPD with emphysema and chronic respiratory failure with hypoxia. His mother required an in-home caregiver to help her with day-to-day tasks. Her medical records documented decreased breath sounds and respiratory symptoms aggravated by moderate activity. The court found that the record, coupled with a finding that the defendant was her only caregiver, created an extraordinary and compelling reason for a

---

[2] According to Mahone, he has served approximately 55 percent of his sentence. Supp. Mot., ECF No. 81 at 26. According to the BOP, he has a projected release date of October 29, 2020.

12

sentence reduction. Blackbird, 2024 WL 3552446, at *3. In Mahone's case, he has not submitted medical records documenting the severity of his father's illnesses, but only a list of health issues with a notation that Mahone's father should contact his health care provider and let them know whether the list is up to date. Health Issues, ECF No. 81-10. The record indicates some of the issues started as early as 2013 but does not indicate which issues are current, whether they are chronic or acute, or the impact they have on his ability to provide self-care or attend to his activities of daily living. The record also indicates that Mahone's father went to the emergency room with a kidney stone in November 2024, ECF No. 81-6, but does not indicate the outcome of that visit.

In Ingram, the defendant presented evidence from his parents' physician that his parents were 86 and 83 years old, and had declined in their level of independence, suffering falls, ataxia, imbalance, poor endurance and overall general loss of function due to their aging and complex chronic medical conditions. Ingram, 2024 WL 1719932 at *2. The defendant presented evidence that his father needed a caretaker to assist with his daily needs due to COPD, hyperlipidemia, hypertension, congestive heart failure, gastroesophageal reflux, Stage 3b chronic kidney disease, and mixed restrictive and obstructive lung disease. Id. Ingram's mother had cared for his father until she became incapacitated by obesity, congestive heart failure, osteoarthritis, a limited ability to stand and walk, high blood pressure, arterial fabulation, loss of hearing, bladder control problems, and a history of melanoma surgeries. Id. The court concluded that the combination of the wife's affidavit stating that she was no longer able to care for her husband, her age, her medical records, and the physician's opinions that she could greatly benefit from familial aid provided a sufficient evidentiary basis for

finding the defendant's parents were incapacitated. Id. In addition, at the time of the court's decision, the defendant had approximately two years remaining on a 10-year sentence and was eligible for release to home confinement six months prior to his release date. Id. at 3.

As set forth above, Mahone has not provided sufficient evidence from which the court can conclude that his father is incapacitated. The record indicates that while his father has some serious medical conditions, he gets around his house with the aid of a walker, can shower, dress, and feed himself, and presumably heats meals that his sister and mother prepare for him weekly. Although he cannot drive, he receives assistance from his insurance company with getting to dialysis appointments, albeit with an undetermined degree of irregularity. There is no indication that anyone attends dialysis with him, indicating that he can manage the appointments by himself.

Mahone's father is not incapacitated under the BOP standard set out in Program Statement 5050.50 because he can engage in self-care and is not confined to a bed or chair. Nor is he incapacitated under the UPC definition because he maintains the ability to meet essential requirements for his physical health, safety, and self-care, although he needs help with transportation, and assistance with grocery shopping, preparing meals, and household chores and repairs. While Mahone's father clearly has some limitations, and would benefit from assistance, the evidence presented does not support the conclusion that he is incapacitated under any relevant definition.

(b) Only Available Caregiver

Even if Mahone could show that his father is incapacitated, he also must show that he is the only available caregiver for his father. USSG § 1B1.13(b)(3)(C). It is undisputed that

Mahone is his father's only child and that Mahone does not have children of his own. Currently, Mahone's father's sisters and mother provide him with some assistance, although none live closer than a 45-minute drive to where he lives and it is burdensome for them to provide care. The elder Mahone's 66-year-old sister, Darlene Smithwick, and their 96-year-old mother, make a 170-mile roundtrip visit weekly to clean house for Mahone's father, stock his freezer, run errands, and make occasional home repairs. Smithwick and her mother spend two days cooking for Mahone's father each week. Smithwick cannot provide more care because her mother needs help for some of her day-to-day activities and Smithwick must maintain the house the two of them share. Smithwick lives too far away to be helpful during any emergency her brother might experience. Smithwick Letter, ECF No. 81-5.

Another sister, Catherine Harpine, takes her brother to various scheduled doctor appointments, but when his ride to dialysis does not show up, the 45-minute drive between their homes means that Harpine cannot get her brother to his appointment on time and he may not be able to reschedule his appointment for later in the day. Harpine Letter, ECF No. 81-7. Mahone's father has four other siblings between the ages of 72 and 76, all of whom live more than 45 minutes from the elder Mahone, and all of whom struggle with either their own health problems or those of their spouses. Supp. Mot., ECF No. 81 at 14–15.

While it is no doubt difficult for Mahone's father's sisters and mother to provide the assistance he needs, they are doing so. As the court noted in United States v. Donald, No. 21-cr-41-CFC, 2024 WL 4581209, at *4 (D. Del. Oct. 24, 2024), "[a]dult family members with full-time jobs are usually considered to be viable alternative caretakers, even when they live 40 minutes away, … or have other family commitments and health conditions of their

15

own." Id. (citing United States v. Moore, No. 14-209-2, 2020 WL 7024245, at *5 (E.D. Pa. Nov. 30, 2020); United States v. Duprey, No. 10-00101 (RK), 2024 WL 3873938, at *2 n.1 (D.N.J. Aug. 19, 2024)). Compare Moore (defendant's mother's adult daughter lived with her and her niece lived forty minutes away and although both worked full-time, they were not physically incapable of providing care) and Duprey (defendant's mother had part-time in-home care and two adult children living nearby who were able to help) with Paris, 2024 WL 1973153, at *3 (mother placed in care home when her care team determined that there was no safe alternative for her) and Ingram, 2024 WL 1719932 at *2 (when defendant's father's wife became incapacitated, defendant was the only available caretaker). In addition, "[t]he possibility that nearby adult family members may need to shift work commitments or hire aid to care for an elderly family member is not an extraordinary circumstance." Id. Mahone, who has the burden of proof on this issue, has not described whether his family has attempted to hire a caregiver for his father, whether they have investigated grocery delivery services to ease the burden on Smithwick, or whether his father qualifies for any type of in-home care through his insurance company or public assistance. Based on the evidence presented, Mahone cannot show that he is his father's only available cargiver.

In sum, the court is sympathetic to Mahone's desire to care for his father, but the evidence submitted does not show that his father's medical conditions are incapacitating at this time. Nor has Mahone provided sufficient evidence that he is the only available caregiver for his father. Thus, on the record before it, the court cannot conclude that Mahone has shown that his father's health presents an extraordinary and compelling reason warranting a sentence reduction. See United States v. Crisp, No. 1:11-cr-00026-JLT-1, 2022 WL 3448307, at *2 (E.D.

16

Cal. Aug. 17, 2022) ("If a sick parent—absent truly extraordinary circumstances—was considered a compelling reason, virtually any inmate seeking a sentence reduction on this ground could produce one."); United States v. Ingram, No. 2:14-cr-40, 2019 WL 3162305, at *2 (S.D. Ohio July 16, 2019) (noting that the need to care for an elderly parent was not extraordinary because "[m]any, if not all inmates, have aging and sick parents.") Accordingly, Mahone's motions for compassionate release based on his father's health issues are **DENIED**.

### (2) Youth at Time of Offense

Mahone also argues that the court should consider the fact that that he was only 20 years old at the time he committed his offense and the United States Sentencing Commission recently amended its policy statement regarding consideration of a defendant's age. Supp. Mot., ECF No. 81 at 15–16; Reply, ECF No. 87 at 5–6. Effective November 1, 2024, Amendment 829 amended USSG § 5H1.1 to state that a downward departure may be warranted "due to the defendant's youthfulness at the time of the offense or prior offenses." However, the amendment is not retroactively applicable. United States v. John, No. 21-cr-134 (DLC), 2024 WL 5155627, at *3 (S.D.N.Y Dec. 18, 2024); United States v. Stewart, No. 09-CR-0312(4) (PJS/FLN), 2024 WL 4699902 (D. Minn. Nov. 6, 2024) (finding that only amendments listed in USSG § 1B1.10(d) have retroactive effect and Amendment 829, which became effective on November 1, 2024, is not listed in subsection (d)).

Additionally, the court considered Mahone's youth at the time it sentenced him, noting that Mahone was a young man, but had a criminal history that was marked by recklessness and disregard for the personal safety of others. Statement of Reasons (sealed), ECF No. 56 at 3.

Also, the tragic facts that led to J.P.'s death were considered by the court, as well as the fact that Mahone did not provide the methadone to J.P. to make a profit, but acted as an unpaid go-between, obtaining and supplying the drug to all the people who went on the camping trip. Id. Accordingly, the fact that Mahone was only 20 years old at the time he committed his offense does not present an extraordinary and compelling reason for a sentence reduction, either by itself or when considered along with his allegation that his father is incapacitated and Mahone is his only available caregiver.

### C. 18 U.S.C. § 3553(a) Factors

As Mahone has not shown an extraordinary and compelling reason for compassionate release, the court will not address the § 3553(a) factors. See United States v. Bethea, 54 F.4th 826, 833 (4th Cir. 2022) (describing the "extraordinary and compelling" reasons for relief as a threshold for eligibility); United States v. Elias, 984 F.3d 516, 519 (6th Cir. 2021) ("[D]istrict courts may deny compassionate release motions when any of the three prerequisites listed in § 3582(c)(1)(A) is lacking and do not need to address the others.")

### III. Conclusion

For the reasons stated herein, the court **DENIES** Mahone's motions for compassionate release, ECF Nos. 74 and 81.

An appropriate order will be issued.

It is so **ORDERED**.

Entered: 02-13-2025

Michael F. Urbanski
Senior United States District Judge